IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:18 CR 667 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | <u>UNITED STATES OF AMERICA'S</u> |
| DANTE DIXON, | ) | <u>SENTENCING MEMORANDUM</u> |
| | ) | |
| Defendant. | ) | |
| | ) | |

      Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney for the Northern District of Ohio, and Damoun Delaviz and Suzana K. Koch, Assistant United States Attorneys, and hereby submits this sentencing memorandum setting forth the United States' position regarding sentencing for Defendant Dante Dixon ("Dixon"). For the reasons set forth below, and those to be articulated at the sentencing hearing, the United States respectfully submits that a sentence of 123 months is appropriate in this case. The United States also respectfully requests that restitution be ordered consistent with this sentencing memorandum and with the plea agreement.

      The United States submits that, with this sentencing memorandum, it does not intend to contravene the plea agreement in this matter. If the Court understands any of this sentencing memorandum to contravene the plea agreement, the United States respectfully requests that this Court disregard the contravening statement in this sentencing memorandum and instead impose a sentence consistent with the plea agreement.

I.    **FACTUAL BACKGROUND**

The facts and relevant conduct underlying this hearing are extensive, and the details are set forth in detail in Dixon's written plea agreement (R. 35: Plea Agreement, PageID 159-73), the Indictment (R. 6: Indictment, PageID 17-21), the Supplemental Information (R. 33: Supplemental Information, PageID 134-46), and the Final Presentence Report. (R. 41: **SEALED** PSR, PageID 249-87).

In this memorandum and at the sentencing hearing before this Honorable Court, the United States points to and will point to certain facts and details. The United States submits that these facts and details are relevant to the factors set forth in 18 U.S.C. § 3553(a), and the United States points to these facts and details in an effort to highlight Dixon's conduct. In doing so, the United States does not suggest that the rest of Dixon's conduct is insignificant or not noteworthy. Dixon has engaged in a staggering fraud – both in this matter and in the past – and listing every detail that concerns the United States is practically impossible.

The United States highlights the facts and details in this sentencing memorandum only to persuade the Court that a sentence at the top end of applicable guideline range on Counts 9, 10, 11, and 12 is appropriate and that the three mandatory periods of two years of incarceration, on Counts 1, 4, and 7, should be imposed consecutively, rather than concurrently, with each other.

In the instant matter, Dixon engaged in a fraud whereby he created a sham company, Peter J. Sebastion Group LLC ("PJSG"), which served no lawful purpose. Dixon created PJSG for the sole purpose of defrauding others and living a life of extravagance. Dixon represented himself to be the chief executive officer of PJSG. Dixon also at times used other names and represented himself to be another senior executive with PJSG. Regardless of the persona he used, Dixon opened business lines of credit with legitimate businesses across the country. These businesses include limousine service companies, hotels, radio stations, corporate housing

2

companies, and temporary staffing companies. Dixon obtained services from those companies – continuously obtaining only the most high end luxury goods and services – and he never paid any of the companies.

As if this were not enough, Dixon also hired individuals, including B.B., D.M., and L.K., to work for PJSG, his sham company. In hiring them, he obtained their dates of birth, social security numbers and other identifying information. Dixon convinced them that PJSG was legitimate, and put the individuals to work for PJSG. Dixon did not pay B.B., D.M., and L.K. the wages he promised. He also used their identifying information to open credit cards in their names and in some instances, to obtain pay day loans in their names. L.K. quickly sensed something was amiss and resigned from PJSG. Unfortunately, B.B. and D.M. worked for PJSG for longer and suffered greater losses.

**II.    LAW AND ARGUMENT**

      A.    STATUTORY MAXIMUMS AND MANDATORY SENTENCES

Counts 1, 4, and 7, the three of the counts of conviction for violations of 18 U.S.C. § 1028A, carry a mandatory sentence of two years of incarceration. 18 U.S.C. § 1028A(a)(1). By law, the sentence of two years of incarceration must be imposed consecutively to any other period of incarceration imposed on a defendant, with only one exception. 18 U.S.C. § 1028(b)(2). That exception is if a defendant is convicted of multiple violations of § 1028A and thus faces multiple mandatory periods of two years of incarceration. 18 U.S.C. §§ 1028A(b)(2) and (b)(4). In such a case, where a defendant is being sentenced for multiple violations of § 1028A, each of the three two-year periods of incarceration "may, in the discretion of the court, run concurrently, in whole or in part, only with another term of imprisonment that is imposed … for an additional violation of [18 U.S.C. § 1028A], provided that such discretion shall be exercised in accordance with any applicable guidelines and policy statements issued." 18 U.S.C.

§ 1028A(b)(4). The mandatory two year periods of incarceration – whether imposed concurrently or consecutively to each other – must still be imposed consecutively to any other period of incarceration imposed (for violations other than violations of § 1028A). 18 U.S.C. §§ 1028A(b)(2) and (b)(4).

The statutory maximum period of incarceration for count 9 is 20 years, 18 U.S.C. § 1343, and the statutory maximum period of incarceration for counts 10, 11, and 12 are 30 years, 18 U.S.C. § 1344.

B. ADVISORY GUIDELINES CALCULATION

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range." Gall v. United States, 552 U.S. 38, 49 (2007). Appellate courts must review a district court's sentence for procedural and substantive reasonableness. Id. at 51. Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. Id.

1. Counts 1, 4, and 7

For convictions under 18 U.S.C. § 1028A, the United States Sentencing Commission Guidelines Manual ("Sentencing Guidelines") states that "the guideline sentence is the term of imprisonment required by statute." U.S. SENTENCING GUIDELINES MANUAL § 2B1.6(a) (U.S. SENTENCING COMM'N 2018). The Sentencing Guidelines also set for that "Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) shall not apply to that count of conviction." Id. The Sentencing Guidelines also indicate that, when imposing a sentence for multiple violations of § 1028A, the court may impose the mandatory term of two years of incarceration for each count "concurrently, in whole or in part, with each other." U.S. SENTENCING GUIDELINES MANUAL § 2B1.6 app. n. 1(B) (U.S. SENTENCING COMM'N 2018). Application Note 1(B) also points to § 5G1.2 of the Sentencing Guidelines for guidance

4

regarding imposing a sentence for multiple violations of § 1028A. Section 5G1.2 states that "the sentence to be imposed on a count for which the statute (1) specifies a term of imprisonment to be imposed; and (2) requires that such term of imprisonment be imposed consecutively to any other term of imprisonment, shall be determined by that statute and imposed independently." U.S. SENTENCING GUIDELINES MANUAL § 5G1.2 (U.S. SENTENCING COMM'N 2018). Application Note 2(B) of § 5G1.2 provides the following non-exhaustive list of factors to be taken into consideration when determining whether sentences for multiple violations of § 1028A:

> (i) The nature and seriousness of the underlying offenses. For example, the court should consider the appropriateness of imposing consecutive, or partially consecutive, terms of imprisonment for multiple counts of 18 U.S.C. § 1028A in a case in which an underlying offense for one of the 18 U.S.C. § 1028A offenses is a crime of violence or an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B).
>
> (ii) Whether the underlying offenses are groupable under §3D1.2 (Groups of Closely Related Counts). Generally, multiple counts of 18 U.S.C. § 1028A should run concurrently with one another in cases in which the underlying offenses are groupable under §3D1.2.
>
> (iii) Whether the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence for multiple counts of 18 U.S.C. § 1028A.

U.S. SENTENCING GUIDELINES MANUAL § 5G1.2 app. n. 2(B) (U.S. SENTENCING COMM'N 2018). Given the foregoing, the Sentencing Guidelines advise, consistent with 18 U.S.C. § 1028A, that the three mandatory periods of two years of incarceration for counts 1, 4 and 7 be imposed consecutively or concurrently, in whole or in part, to each other, and consecutively to any other period of incarceration imposed.

5

        2.        <u>Counts 9, 10, 11, and 12</u>

The United States submits that, pursuant to the plea agreement and consistent with the final Presentence Investigation Report ("PSR"), the correct offense level for counts 9, 10, 11, and 12, before acceptance of responsibility is 21. (R. 35, Plea Agreement, PageID 157; R. 41, **SEALED** PSR, PageID 262-263). Pursuant to paragraph 20 of the plea agreement and § 3E1.1(a) and (b) of the Sentencing Guidelines, the United States recommends that Dixon's offense level of 21 be reduced by three, provided that Dixon's conduct continues to reflect acceptance of responsibility. This would yield a final offense level of 18, for counts 9, 10, 11, and 12. Given the defendant's criminal history category of IV, the applicable guideline range for counts 9, 10, 11, and 12 would be 41 to 51 months.

    C.    <u>THE COURT SHOULD IMPOSE THE THREE MANDATORY PERIODS OF TWO YEARS OF INCARCERATION CONSECUTIVELY TO EACH OTHER ON COUNTS 1, 4 AND 7 AND IMPOSE A SENTENCE AT THE HIGH END OF THE GUIDELINE RANGE ON COUNTS 9, 10, 11 AND 12.</u>

Section 3553(a) directs a sentencing a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," to wit:

> the need for the sentence imposed -
> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;
> (C)    to protect the public from further crimes of the defendant; and
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). The United States submits the least restrictive sentence that will comply with the purposes of § 3553(a)(2), including the need for the sentence to reflect the seriousness of the offense, to provide just punishment, and to protect the public from further crimes of the defendant is a sentence at the top of the guideline range for counts 9, 10, 11, and 12, and to impose the three mandatory periods of two years of incarceration

6

consecutively to each other. A review of the § 3553(a) factors, including the nature and circumstances of the offense and the history and characteristics of the defendant reveal that the imposition of any lesser sentences would be to impose a sentence that would not serve the purposes of § 3553(a)(2).

        1.    <u>Dixon began committing the instant offenses while he was still under BOP supervision and before he even began the supervised release portion of his sentence, thus demonstrating that in order for the public to be safe from future crimes by Dixon, Dixon must be incarcerated.</u>

Dixon has already demonstrated, by his own actions, that if he is given the opportunity to be anywhere outside of the custody of the Bureau of Prisons ("BOP"), he will commit serious federal crimes. At the time he committed the crimes for which he is currently being sentenced, Dixon was either in the custody of the BOP or on supervised release. (NDOH 5:17-cr-00230, R. 5: Violation Report, PageID 51)[1]. The BOP has further indicated to the United States that when Dixon was completing his sentence of 37 months of incarceration, handed down in the District of New Jersey, Dixon was transferred on or about August 26, 2016 to a halfway house in Akron, Ohio, and was moved to home confinement in Akron on or about November 23, 2016. Dixon remained on home confinement until February 23, 2017, when he began the term of his Supervised Release, which was shortly thereafter transferred to the Northern District of Ohio.

Dixon has admitted to this Court that the same time period – the end of 2016 and the beginning of 2017 – is when he committed many of the criminal acts underlying his current guilty plea and for which he is now awaiting sentencing. (R. 35: Plea Agreement, PageID 160-61, 166-71). Despite being under the supervision of the Bureau of Prisons in a halfway house

---

[1] At times in this Sentencing Memorandum, the United States references the record in not only this matter, but also in Dixon's Supervised Release matter, case number 5:17cr230 in the U.S. District Court for the Northern District of Ohio. When the United States references the record in Dixon's Supervised Release matter, it will include the docket number in the citation – e.g. (NDOH 5:17-cr-00230, R. 5: Violation Report, PageID 51). When the United States references the record in the instant matter, it will not include the docket number in the citation – e.g. (R. 35: Plea Agreement, PageID 160-61, 166-71).

and then on home confinement, Dixon created the opportunity for himself to commit extensive acts of Aggravated Identity Theft, Wire Fraud, and Bank Fraud.  Dixon has pled guilty to conduct which he committed while he was still under the supervision of BOP and when he was on supervised release.

Dixon has – by his own admitted conduct – demonstrated to this Court, that unless he is incarcerated, he will continue to commit serious fraudulent offenses; he has demonstrated that in order to satisfy subsection (C) of § 3553(a)(2) – the need for the sentence imposed to protect the public from further crimes by Dixon – Dixon must be incarcerated.

> 2. <u>Dixon took steps to avoid detection and to avoid compliance with the terms of his supervised release so that his supervising officer would not notice his illegal conduct, and as such, Dixon has demonstrated that he will overcome any obstacle – short of incarceration – to continue committing crime.</u>

In 2017, Dixon was released from BOP custody and began a term of supervised release in the Northern District of Ohio.  (NDOH 5:17-cr-00230, R. 5: Violation Report, PageID 51).  Shortly thereafter, in September of 2017, Dixon's probation officer attempted to install computer monitoring equipment on Dixon's telephone and computer, given Dixon's history and the nature of his convictions.  (Id., PageID 54).  Per the Violation Report, Dixon indicated to his probation officer that his cell phone and computer were owned by Peter J. Sebastian Group, and as a result, the probation officer was unable to install the monitoring software on the cell phone and computer.  (Id.)

Now, Dixon has pled guilty and admitted to this Court that Peter J. Sebastion Consulting Group, LLC was a "sham business entity" that he created and that it "sold no legitimate goods or services."  (5:18CR667, R. 35: Plea Agreement, PageID 159).  Dixon also admitted that he made himself Chief Executive Officer of this sham business entity and often directed others to act on his behalf.  (Id., PageID 134-46).  Dixon's admitted frauds continued into August 2017 and

September 2017, including his fraudulent acts against LimoLink and Kelly Services.  (Id., PageID 162-66).

These simple and straightforward facts again serve as a reminder that Dixon – by his own admitted conduct – has demonstrated that unless he is incarcerated, he will continue to commit fraudulent acts.  There are no conditions on his freedom – short of incarceration – which Dixon will respect and which will deter or incapacitate him from committing other crimes.

>   3. <u>Dixon has demonstrated that he will go to any lengths and fabricate any untruth to perpetuate his crimes and avoid detection.</u>
>       a. In order to continue perpetuating his fraud, Dixon falsely accused D.M., who was one of the victims of his fraud, of having committed a sexual assault.

According to an Akron Police Department report, after a short time where D.M. had been working for Dixon and PJSG and D.M. was not receiving payment, D.M. questioned Dixon about the status of his job with PJSG.  Shortly thereafter, D.M. and B.B., who started working for PJSG like D.M. around the same time, started receiving odd emails from Dixon and from one of Dixon's aliases, Justin Carrington.  In those emails, Dixon blamed D.M. and B.B. for the poor financial status of PJSG.

Dixon also demanded that D.M. return his vehicle, a BMW, that Dixon had arranged for D.M. to acquire as a company car.  Later, Dixon left a voicemail for D.M., stating that Dixon had received a call from police detectives who stated that D.M.'s vehicle had been involved in a sexual assault in downtown Akron.  In the voicemail, Dixon also stated that there were pictures showing D.M. and another man "trying to pick up a drunk woman at a local club." Dixon demanded the immediate return of the vehicle.

Even though the car was supposed to be a company car, D.M. was making payments on the car.  D.M. stated to the Akron Police Department that he did not return the car because he

9

knew he hadn't done anything wrong. An Akron Police Department detective recently confirmed that Dixon's claim was bogus and confirmed that D.M.'s name appears in APD's incident reports on only one occasion in 2017, and that is as a victim in Dixon's frauds. The detective also confirmed that the Akron Police Department had no record of a BMW being involved in any type of sexual assault in 2017.

The audio recording of Dixon's voicemail for D.M. will be presented to the Court at the sentencing hearing.

>    b.   In order to continue perpetuating his fraud, Dixon represented himself to be Justin Carrington and repeatedly (and falsely) reiterated to an employee with Kelly Services that PJSG had indeed made payment to Kelly Services for $24,000 that PJSG owed.

Dixon has pled guilty to defrauding Kelly Services, a staffing service company with a location in Miami, Florida, to have a temporary employee work for PJSG. (R. 35: Plea Agreement, PageID 164-66). At some point during the fraud, Kelly Services grew suspicious of PJSG, and ceased providing a temporary employee to PJSG. In response to Kelly Services' action, Dixon called Kelly Services, represented himself to be Justin Carrington, and reiterated again and again that PJSG had indeed made payment and that PJSG's accounts had been debited. Dixon's statements were a lie, as Kelly Services insisted.

The audio recording of Dixon's call with Kelly Services will be presented to the Court at the sentencing hearing.

The United States submits that the above to episodes are not isolated episodes and reflect the depths of deception to which Dixon so easily went in order to perpetuate his fraud. The United States submits that these acts reveal the true seriousness of Dixon's crimes and demand a harsh sentence from this Court.

>    4.   <u>Dixon's criminal history reveals that lenient criminal sanctions do not</u>

<u>deter him from committing additional crimes.</u>

Dixon has a long history of committing fraud related crimes. His earliest conviction came at the age of 23, and for the past thirty years, Dixon has committed fraud related offenses. For every day of the past 18 years, Dixon has been in federal custody or on federal supervision for fraud related offenses. In that time, he has been in and out of prison and incurred more and more convictions. Dixon's criminal history reveals that he does not care about the consequences of his actions. He has repeatedly committed fraud related crimes and repeatedly been sent to prison, and yet he has continued to commit fraud related crimes. His actions demonstrate that the only means by which the public may be protected from future crimes by Dixon is to incarcerate him. With any opportunity he has been given to be out of custody, Dixon has used that opportunity only to commit more crimes, victimize more people and to further harm the public.

      a.    <u>Dixon defrauded one company, Empire CLS, on two occasions – in or about 2013 and again in 2016-17.</u>

In an effort to demonstrate to this Court how impervious Dixon is to criminal sanction, the United States points not only to Dixon's criminal history, but also to the fact that Dixon, in this matter, has pled guilty to defrauding Empire CLS, a limousine company with a location in New Jersey, in the amount of $97,855.45. (<u>Id.</u>, PageID 166). Making matters worse, Dixon defrauded this very same company approximately five years before this instant fraud. An administrator with Empire CLS told the Akron Police Department that because Dixon had changed his name from Dante to Dan and also used the alias of Justin Carrington and the PJSG pretext, Empire CLS was not able to detect the fraud. Dixon went to federal prison after that fraud, in a case in the District of New Jersey, case number 2:13cr806, although Empire CLS is not listed as a victim in the PSR for that case.

11

Nonetheless, the United States submits that Dixon's actions demonstrate that the sentence imposed there – 37 months of incarceration consecutive to a sentence of 12 months and 1 day of incarceration – will do nothing to deter Dixon from committing fraud related crimes. Instead, Dixon has demonstrated that he is in fact willing to go back to the same well and defraud the same company over and over again.

> 5. <u>Dixon has pointed to his need for medical treatment as a basis for a lenient sentence, but points to no means by which he would lawfully obtain such medical treatment.</u>

In his sentencing memorandum to this Court, Dixon has argued that he suffers from a serious medical condition and that because of this medical condition, this Court should not impose a lengthy period of incarceration. The sentencing memorandum states that "Such medical attention is costly and requires a knowledgeable and well-trained medical staff to treat effectively." (R. 46: **SEALED** Sentencing Memorandum, Page 6).

Dixon, however, has provided no indication, how, exactly he intends to pay for or obtain such costly medical attention. As part of the plea agreement, Dixon was obligated to complete a Financial Statement of Debtor so that the United States could make a meaningful effort to identify and lawfully recover his assets so that the victims of his fraud could receive restitution. A redacted copy of the Financial Statement of Debtor that Dixon completed will be provided to the Court at the sentencing hearing. In it, Dixon states he is not self-employed and does not operate a business. He indicates he does not have an employer. He indicates that he has no other sources of income and has no banking or investing accounts. He also indicates that he has no available lines of credit and no life insurance. In sum, he has signed the form, declaring under penalty of prosecution under 18 U.S.C. § 1001, that he has absolutely zero assets, and yet he is asking this Court that he not be incarcerated so that he can obtain medical treatment that he states is "costly."

12

Instead of indicating how he would pay for such costly treatment, Dixon instead, baldly and without any scientific basis, claims that the medical attention that he is receiving in custody is "inadequate" and that he will suffer "due to the neglect of the medical staff" at the current facility where he is being held.  The United States submits that Dixon has provided no indication as to how he would lawfully obtain better medical treatment than the medical treatment he is provided while incarcerated.

      6.    <u>Dixon is aware of the dangers of the very crimes he has committed and he committed them anyways.</u>

The United States notes that Dixon's PSR indicates that Dixon's credit report includes a protection and security alert against fraud.  (R. 41: **SEALED** PSR, PageID 276).  The alert states indicates that "Fraudulent applications may be submitted in my name or my identity may have been used without my consent to fraudulently obtain goods or services. Do not extend credit without first verifying the identity of the applicant."  (<u>Id.</u>).  The irony of Dixon protecting himself against the very crimes which he has pled guilty to committing here – and which he was convicted of having committed in 2000 (<u>Id.</u>, PageID 266-67) as well as in 1998 (<u>Id.</u>, PageID 265-66) – suggests that Dixon made no mistake in committing his crimes.  He committed his crimes with his eyes wide open, and he fully understood the harm he was inflicting on others.  The United States submits that this militates in favor of a serious sentence being imposed.

      7.    <u>Dixon cannot claim he committed these crimes out of necessity or to provide for himself and those he loved. He committed these crimes out of greed and because he could.</u>

Finally, the United States points to the nature of Dixon's crimes to point out that Dixon cannot point to the equities of his crime and suggest that he committed his crimes out of necessity or that he was motivated by honorable reasons.

13

Dixon committed his crimes out of greed. He committed his crimes because he could commit his crimes. He committed his crimes because he wanted to ride in fancy cars, stay in fancy hotels, and live a fancy style. He had no way to pay for such things, and so he lied and lied and lied, defrauding companies out of hundreds of thousands of dollars, and stealing the identity from three innocent individuals, making them suffer for years so that he could live a luxurious lifestyle.

In Exhibit D to his sentencing memorandum, Dixon attached examples of promotion materials for PJSG events. One of the promotional items, attached hereto as Attachment 1, is for an event on December 12, 2016 at the Courtyard Marriott in Akron, Ohio. This is one of the very fraudulent events Dixon created and which caused nearly $3,000 in loss for the Courtyard Marriott – i.e. one of the fraudulent events to which Dixon has pled guilty. The invoice for the event – from the Courtyard Marriott to PJSG – is attached hereto as Attachment 2. Dixon expended $2,818.01 in food, drink, and liquor. He defrauded Courtyard Marriott so that he could have an expensive event at a nice, new hotel. In the course of approximately 1 month, Dixon defrauded Courtyard Marriott of $11,456.68, just so that Dixon could live a life of luxury.

The United States submits that this evidence demonstrates how little regard Dixon had for the consequences of his actions and how little intent Dixon had for the individuals and corporations he was defrauding.

### D. THE COURT SHOULD ORDER RESTITUTION AGAINST DIXON PURSUANT TO THE MANDATARY VICTIM RIGHTS ACT.

Restitution orders are authorized by statute, 18 U.S.C. §§ 3663, 3663A, and 3664, and are distinct and separate from the United States Sentencing Guidelines. When sentencing a Defendant convicted of an offense against property under Title 18 of the United States Code,

14

including any offense committed by fraud or deceit, the Mandatory Victims Restitution Act (the "MVRA") requires the court to order that the defendant make restitution to the victim of that offense. 18 U.S.C. §§ 3663A(a)(1); 3663A(c)(1)(A)(ii). The MVRA requires those convicted of offenses against property under Title 18 to pay restitution for victims' losses. United States v. Elson, 577 F.3d 713, 721 (6th Cir. 2009).

Restitution constitutes punishment. United States v. Schulte, 264 F.3d 656 (6th Cir. 2001); see also United States v. Bearden, 274 F.3d 1031, 1041 (6th Cir. 2001) (restitution is "punitive rather than compensatory in nature"). "Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity." United States v. Sosebee, 419 F.3d 451, 462 (6th Cir. 2005). "Restitution under the MVRA is a criminal penalty and a component of the defendant's sentence." United States v. Adams, 363 F.3d 363 (5th Cir. 2004) (quoting United States v. Chaney, 964 F.2d 437, 451 (5th. Cir. 1992)).

The MVRA specifically states that the amount of restitution should be equal to the "amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (when a court is ordering restitution, the amount of restitution should be equal to the "amount of each victim's losses as determined by the court." *Sosebee*, 419 F.3d at 462 (18 U.S.C. § 3664(f)(1)(A) (emphasis in original)).

### A. Defendant Dante Dixon's fraudulent conduct caused financial losses to his victims.

Restitution should be made payable by Defendant Dante Dixon, to his victims, L.K., B.B D.M., Fox Corporate Housing, Limo Link, Metropolitan Limo, Kelly Services, Empire CLS,

15

Residence Inn Fairlawn, Rubber City Radio, Marriot Courtyard, and Hilton Garden Inn, in the total amount of $443,542.20, to be paid in the amounts as follows:

| | |
|---|---|
| L.K. | $4,697.28 |
| B.B. | $13,385.84 |
| D.M. | $10,744.60 |
| Fox Corporate Housing | $16,410.00 |
| LimoLink | $57,871.06 |
| Metropolitan Limo | $158,431.62 |
| Kelly Services | $39,187.52 |
| Empire CLS | $97,855.45 |
| Residence Inn Fairlawn | $5,166.55 |
| Rubber City Radio | $11,705.00 |
| Marriot Courtyard | $11,458.68 |
| Hilton Garden Inn | $16,628.60 |
| **TOTAL** | **$443,542.20** |

In this case, the victims were directly harmed as a result of the Defendant's fraud. As a direct and proximate result of Defendant's conduct, the victims suffered financial loss. This loss would not have occurred if not for the Defendant's fraudulent actions.

**B.     Conditions of Restitution**

The United States requests that the Court establish the following conditions of restitution payment in accordance with the Court's authority under 18 U.S.C. §§ 3572 and 3664(f) and (i), which should be applicable until such time as Dixon has satisfied the financial obligations to be imposed by the judgment:

1. the special assessment must be paid in a lump sum due immediately;

2. payment of restitution is due immediately; and

3. that individual victims be repaid before corporate victims.

The United States requests that whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the

Court imposes a schedule of payments, the United States requests that it be a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If Defendant receives an inheritance, any settlements (including divorce settlement and personal injury settlement), gifts, tax refunds, bonuses, lawsuit awards, and any other receipt of money (to include, but not be limited to, gambling proceeds, lottery winnings, and money found or discovered) the Defendant must, within 5 days of receipt, apply 100% of the value of such resources to any restitution still owed.

### III.  CONCLUSION

Wherefore, based on the foregoing, the United States respectfully asks this Honorable Court to impose the longest permissible period of incarceration that is consistent with the plea agreement. The United States submits that such a sentence would be a sentence of 123 months of incarceration. Such a sentence would be based on a sentence of 51 months – a sentence at the high end of the applicable guideline range – on counts 9, 10, 11, and 12. Such a sentence would also be based on a total of 72 months of incarceration on counts 1, 4 and 7. The United States requests that this Honorable Court impose the three mandatory periods of two years of incarceration, on counts 1, 4 and 7, consecutively to each other and consecutively to the period of incarceration imposed on counts 9, 10, 11, and 12.

The United States also respectfully requests that the Court order immediate payment of restitution by the Defendant to his victims, L.K., B.B., D.M., Fox Corporate Housing, Limo Link, Metropolitan Limo, Kelly Services, Empire CLS, Residence Inn Fairlawn, Rubber City Radio, Marriot Courtyard, and Hilton Garden Inn, in the total amount of $443,542.20.

The United States again reiterates that, if it does not intend for any of the foregoing to contravene the plea agreement in this matter. If the Court understands any of the foregoing to contravene the plea agreement, the United States respectfully requests that this Court disregard

the contravening statement in this sentencing memorandum and instead impose a sentence consistent with the plea agreement.

.

                                              Respectfully submitted,

                                              JUSTIN E. HERDMAN
                                              United States Attorney

By:   /s/ Damoun Delaviz
       Damoun Delaviz (PA: 309631)
       Assistant United States Attorney
       Federal Building
       2 South Main Street, Room 208
       Akron, OH 44308
       (330) 761-0530
       (330) 375-5492 (facsimile)
       Damoun.Delaviz@usdoj.gov

       /s/ Suzana K. Koch
       Suzana K. Koch (OH: 0073743)
       Assistant United States Attorney
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3748
       (216) 522-4982 (facsimile)
       Suzana.Koch@usdoj.gov

CERTIFICATE OF SERVICE

    I hereby certify that on this 27th day of September, 2019, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

                                              /s/ Damoun Delaviz  
                                              Damoun Delaviz  
                                              Assistant U.S. Attorney